Nott, J.,
dissenting:
The facts upon which this case turns are, first, that the contract here was made by the Surgeon-General, (for the medical purveyor who signed it was merely one of the Surgeon-General’s staff in Washington;) and, second, that the Assistant Surgeon-General’s order to furnish ice said to the contractor, “The ice to be delivered at Nashville and Memphis -[20,000 tons] is for the use of the sick of the armies in the field, and should be furnished without delay.”
The supplies for the Army are and always have been purchased, so far as practicable, by the Quartermaster-General, the Oommissary-General, and the Surgeon-General. Having thus beeu obtained by the head of the military bureau at the seat of Government, they are then taken in charge and distributed by the chief quartermaster, commissary, or surgeon in the military department or district for which they have been provided; and he represents, and to all intents and purposes is, the Quartermaster-General, Oommissary-General, or Surgeon-General in that department or district. To avoid the risk and inconvenience of actual storehouses or depots of supplies, the contract system has been resorted to, by which contractors furnish as called, upon the supplies of a department or district. These contracts are, in effect, handed over to the chief quartermaster, commissary, or surgeon, and he issues requisitions and takes charge of their performance precisely as though he had made them himself, or as though they were a depot of supplies committed to his official care.
That the Assistant Surgeon-General of the Army in 1863, while in charge, as chief medical officer, of an immense military district, embracing about half the theater of actual warfare, had not the same authority which has been exercised in every branch of the Army in like cases time out of mind; that he had not power to call upon the contractors for his department to furnish the supplies provided for it; that he was the one exception to the universal rule of Army administration; or that it was necessary for the Surgeon-General himself to go down to the department and distribute the supplies which he had provided by contract for it, are propositions which will be regarded *622 by every person conversant with Army matters as purely theoretical or speculative, framed in entire disregard of long-established and well-settled official rules and administrative usages.
But whether the Assistant Surgeon-General had or had not authority to order the ice-contractor for his department to furnish the ice required for his hospitals need not be discussed in this case, inasmuch as the order which forms the basis of the suit, and the cause of the claimants’ damage, was that of the Surgeon-General himself. In the Army, when a superior officer amends, modifies, or changes the order of his inferior, it immediately becomes his order. If the Assistant Surgeon-General had no authority to order the claimant to deliver this icé “ without delay,” as he did, the Surgeon-General, if he did anything, should have revoked the order an^l notified the contractor. He could not adopt it so far as to keep it in suspense, and at the same time declare that it never had vitality. To suspend it was to give it vitality if it had none, and to that extent to ratify it. The same principle prevails in the common law, for there is no such thing as ratifying and not ratifying; as adopting and not adopting; as keeping the act of an agent in existence, and declaring that it never had existence. Somebody had power under this contract to order this contractor to furnish this ice and to designate the places where it was to be delivered; and when the Surgeon-General interfered with the action of the local administrative officer in charge, he was bound to do one thing or the other — to revoke the order for want of authority, or to modify it and assume the consequences.
The question, therefore, is whether this order has caused damage to the claimants, and the nature and the extent thereof.
The terms of the contract were that the claifuant should deliver at designated places “the whole amount of iee required to he consumed at each respective point and vicinity during the remainder of the year 1863,” and that the defendants should pay a designated price “for each and every ton of ice delivered, and accepted by the medical officer in charge.” Upon these obligations the claimant contends that the order to deliver 30,000 tons of ice bound the defendants to accept that quantity as effectually as if it had been written in the contract. It is also insisted that the perishable nature of the commodity, and the fact that the order to deliver was not revoked, but kept in suspense, are dis *623 tinctions which take the case out of the rule laid down by this court in Bulkley’s Case, (7 C. Cls. R., 543,) which was affirmed by the Supreme Court, (9 id., 81.)
That rule is, that, where parties contract for such unknown amount.as the uncertainty of military affairs may require during a designated period, the contractor thereby agrees to share in that uncertainty, and cannot recover profits unless his services or his merchandise were actually required; but where the defendants throw upon the contractor needless expense by notifying him to perform and then revoking the order, he should recover the damage which he has actually suffered. The fact that this contractor’s commodity was of the most perishable nature was a fact known to him when he agreed to deliver the amount of ice “ required to be consumedand the fact that the order for 30,000 tons was suspended and not revoked goes only to the extent of the loss, and not to the nature of the breach. There is no distinction that I can perceive between the nature of the damage in this and in the former case.
The question then arises, to what extent should the claimant recover? He should not recover the profits which he might have made on the 17,232 tons of ice ordered, but not accepted, because it was not “ required to be consumed.” He should not recover his actual losses upon any ice purchased before the defendants’ order for 30,000 tons was given, for such purchases were made upon his own responsibility and at bis own risk. He should not recover for any ice purchased upon the faith of the order and subsequently delivered to the defendants, for as to such this order caused him no damage. Applying these restrictions to the facts of the case will reduce his recovery to the losses which he.actually suffered on the 10,000 tons of ice purchased at Lake Pepin. That this ice proved a total loss to the contractor, and that he did not involve himself in additional loss by trying to move it after the order was suspended, I deem immaterial. A large quantity of ice is not a commodity that can be handled and thrown upon the market in warm weather, nor sent forward and stored to await a demand. If the order to deliver 20,000 tons at Memj)his and Nashville “ without delay” had not been suspended on the 2d April, the claimant could have thus disposed of this parcel at Lake Pepin. The order to deliver caused him to purchase it j the suspension of the order *624 occasioned its loss; and for his actual damages thus suffered the defendants are liable.
Peck, J., was not present when the decision was announced, but took part in the consideration of the case and agreed in the opinion read by Nott, J.